*250 Opinión disidente emitida por
la Jueza Asociada Señora Fiol Matta,
a la cual se unen el Juez Presidente Señor Hernández Denton y la Juez Asociada Señora Rodríguez Rodríguez.
Los progresos sociales ... se reali-zan en función del progreso de las mujeres hacia la libertad, y las de-cadencias de orden social se reali-zan en función de la disminución de la libertad de las mujeres.(1)

Charles Fourier

La división de los miembros del Tribunal avala hoy una sentencia del foro apelativo que le niega la protección de la Ley 54 a una mujer por la sola razón de ser adúltera. Esa ratificación excluye a los agresores dentro de relaciones adulterinas del rigor de la Ley para la Prevención e Inter-vención con la Violencia Doméstica, también conocida como la Ley 54. (2) El efecto práctico de dicha exclusión es privi-legiar a los agresores adúlteros y dar carta blanca al mal-trato de pareja en esas situaciones, so color de proteger la institución familiar.
Poco pesa en el ánimo de quienes se niegan a aplicar la ley a los hechos del presente caso el que otra mujer haya sido víctima de la violencia de pareja en nuestro país. La Ley 54, que tipifica el delito de maltrato entre parejas de diversos tipos,(3) se aprobó para atender este mal.(4) Resol *251 ver que sus disposiciones no aplican a un incidente de vio-lencia que surge dentro de una relación consensual, únicamente porque uno de sus participantes está casado con otra persona, conlleva ignorar el claro propósito de la ley y vendarse los ojos ante la innegable realidad de que la violencia machista, no importa el tipo de relación en que ocurra, está cobrando decenas de vidas anualmente y afec-tando a miles de personas en nuestro país.
Decisiones como esa desechan el fin expreso de proteger la vida, la seguridad y la dignidad de las personas involu-cradas en relaciones de pareja que persiguió la adopción de ese estatuto. Limitar los remedios y mecanismos de protec-ción para las víctimas de la violencia de pareja, injustifica-damente y en obvia contravención con el verdadero espí-ritu de la Ley 54, es un error judicial que pagarán con más sufrimientos las propias perjudicadas. Como no puedo guardar silencio ante semejante desacierto, disiento.
I
El Sr. José Miguel Flores Flores y la Sra. Carmen Romero Pérez mantuvieron una relación de pareja, que in-cluyó relaciones sexuales sin cohabitación, por aproxima-damente diez meses, estando ella casada con otro hombre. En mayo de 2006, Flores Flores y Romero Pérez tuvieron una discusión que concluyó con actos de agresión de él contra ella y su posterior denuncia. Los hechos violentos in-cluyeron interceptar el vehículo de la señora Romero Pé-rez, golpearla, halarle el pelo y apretarla por el cuello. El Ministerio Público imputó al señor Flores Flores haber co-metido el delito de maltrato tipificado en el Artículo 3.1 de la Ley 54 (8 L.P.R.A. sec. 631).
Tras la vista preliminar y la lectura de acusación, el señor Flores Flores solicitó que se desestimara el caso bajo el fundamento de que no se determinó causa probable con arreglo a la ley y al derecho, establecido en la Regla 64(p) *252 de Procedimiento Criminal(5) A su favor, el acusado argu-mentó que la Ley 54 no aplica a relaciones adúlteras, por lo que no estaban presentes los elementos del delito imputado. El Ministerio Público replicó que la Ley 54 no contiene disposición alguna sobre el estado civil de la per-judicada y que la relación que sostuvo el acusado con la víctima está contemplada en el concepto “relación consensual” que especifica en Artículo 3.1, supra. El Tribunal de Primera Instancia denegó la petición de desestimación. El Tribunal de Apelaciones revocó al de instancia, por enten-der que las relaciones adulterinas quedan fuera del ámbito protector de la Ley 54.
Luego de examinar detenidamente el expediente y el derecho aplicable, revocaría la Sentencia del tribunal ape-lativo y reinstalaría la acusación para que el foro primario continúe con los procedimientos. Sin embargo, como la división de este Tribunal confirma la sentencia recurrida, no puedo menos que disentir.(6)
II
A. La Ley 54: su aprobación y objetivos
Diversos proyectos legislativos sometidos desde 1984 re-conocían el problema social de la violencia de pareja,(7) pero no fue hasta 1989 que se logró aprobar una ley especial para atenderlo. El 2 de febrero de 1989, la senadora Velda González presentó el Proyecto del Senado 90, para añadir el Artículo 122-A al Código Penal de Puerto Rico y *253 tipificar el delito de maltrato conyugal.(8) Posteriormente, el Ejecutivo presentó el Proyecto del Senado 470 y el Pro-yecto de la Cámara 615. Tras la celebración de vistas pú-blicas, foros y reuniones con profesionales de la salud mental, educación y derecho, se redactó un proyecto de ley sustitutivo que recogió las inquietudes de los diversos bo-rradores y las recomendaciones de los expertos. Entonces, se aprobó la Ley para la Prevención e Intervención con la Violencia Doméstica o Ley 54.
Como todo análisis de un estatuto que tipifica una con-ducta como delictiva, nuestro estudio de la Ley 54 nos re-quiere, en primer lugar, identificar cuál fue el interés único que la Asamblea Legislativa pretendió tutelar, al tipificar el delito de maltrato en la relación de pareja. Ello, pues “la indagación y concreción del bien jurídico protegido es cues-tión previa en todo estudio jurídico de un tipo delictivo”.(9) Concretamente, el bien jurídico ha de definirse “como el objeto inmediato de protección de la norma penal”.(10) So-bre esto, el profesor Lascuraín Sánchez explica que
[l]a norma penal es una directriz coactiva de conducta que, por una parte, aísla conceptualmente un determinado tipo de com-portamientos y, por otra, pretende su evitación o su realiza-ción a través de la amenaza de la pena y de los diversos efectos ... que ésta despliega en sus destinatarios. El bien jurídico-penal indica sintéticamente la razón principal de la coacción, al expresar el objeto afectado por los comportamientos amena-zados y cuya protección es el fin que ha motivado la puesta en marcha del mecanismo instrumental penal.(11)
*254 Para determinar cuál es el bien jurídico protegido por la norma penal tenemos que examinar las conductas prohibi-das “en relación con el enunciado legal principal, con el tipo inicial del injusto [y] con otras normas, de incrimina-ción y permisivas, con las que aquel enunciado se relaciona”(12) Esto porque la norma penal representa el valor social que el legislador le brinda a la realidad agredida y su vulnerabilidad(13) Por consiguiente, examinemos en detalle la Ley 54, su historial legislativo y los estudios que se han realizado sobre la violencia de pareja.
Para empezar, el título de esta legislación es inexacto porque, como veremos, no se ajusta a su contenido. El tér-mino “violencia doméstica” cubre conductas no contempla-das por la Ley 54. Ganzenmüller aclara que la violencia doméstica se entiende como
toda acción u omisión física, psíquica o sexual practicada sobre los miembros más débiles de una comunidad familiar, funda-mentalmente las ejercidas sobre los menores, mujeres y ancia-nos, así como las derivadas de la ruptura de la convivencia o relación afectiva, que cause daño físico o psicológico o maltrato sin lesión. (Comillas y énfasis suprimido.(14)
Sin embargo, la Ley 54 no se limita a prohibir el mal-trato en el ámbito doméstico, sino que criminaliza la vio-lencia contra cualquier pareja o expareja(15) Es decir, puede que la víctima y el agresor compartan el espacio doméstico o puede que no; lo importante es que sostengan o hayan sostenido una relación íntima. Por otro lado, aunque la Ley 54 regula de forma secundaria asuntos relacionados a la violencia entre la pareja, como la custodia de los hijos *255 e hijas de los actores del delito, no tipifica como delito el maltrato de menores o ancianos. Para proteger a estos miembros del espacio doméstico hay artículos específicos en el Código Penal.(16)
Por consiguiente, el propósito principal de la Ley 54 fue terminar con la violencia de pareja y proveer protección inmediata a las víctimas de este tipo de agresión, quienes eran, principalmente, mujeres.(17) Según dispone el Ar-tículo 1.2 de la Ley 54, que establece la política pública del estatuto, se pretendía “dar énfasis a atender las dificulta-des que las situaciones de violencia doméstica presentan, particularmente a mujeres y menores, para preservar su integridad física y emocional, procurar su seguridad y sal-var sus vidas”.(18) Es por esto que en Pueblo v. Ruiz, supra, explicamos que las ponencias ante las comisiones legislati-vas revelan que el enfoque principal de la legislación es la protección de las mujeres maltratadas en la relación de pareja. (19)
*256 Más importante aún, el texto de la ley establece el obje-tivo de lograr suprimir la justificación cultural de la vio-lencia contra las mujeres que le atribuye a estas ser causa de su victimización cuando alegadamente no se comportan según las expectativas de los varones. Esta justificación de la violencia de pareja se fundamenta en la convicción de que la mujer es propiedad del hombre, es decir, en una ideología tradicionalmente patriarcal.(20) Nuestra sociedad, como tantas otras, respondía a esta mentalidad patriarcal hegemónica, que concibe la violencia de pareja como un problema que debe resolverse en el ámbito privado o doméstico.(21) Así, por razones histérico-culturales, no se concebía que golpear a una compañera íntima fuese un crimen o un delito.
Por esa razón, antes de la Ley 54, como regla general, las autoridades públicas no intervenían en este tipo de situación.(22) La Ley 54 expresamente reconoce la impor- *257 tancia de transformar esta mentalidad. Sobre ello, el Ar-tículo 1.2 de la Ley 54, supra, dispone lo siguiente:
La violencia doméstica es una de las manifestaciones más crí-ticas de los efectos de la inequidad en las relaciones entre hombres y mujeres. Las ideas, actitudes y conductas discrimi-natorias también permean las instituciones llamadas a resolver y a prevenir el problema de la violencia y sus consecuencias. Los esfuerzos de estas instituciones hacia la identificación, comprensión y atención del mismo han sido li-mitados y en ocasiones inadecuados.(23)
Ante este panorama, la Ley 54 tuvo la encomienda de informar de forma contundente a la ciudadanía y a los ofi-ciales del orden público que la violencia de pareja no sería tolerada. Además, aunque la ley utilizó lenguaje neutral, advirtiendo que este tipo de violencia es igualmente delic-tiva cuando es perpetrada por la mujer, reconoció la reali-dad de que esos casos eran ínfimos.(24) El mensaje no podía ser más claro: ya el hombre no podía agredir a “su” mujer sin que alguien interviniera.(25) Con este mensaje, los legis-ladores intentaron eliminar actitudes, patrones de con-ducta y prácticas de dominación que promovían y condona-ban la violencia de pareja.
A pesar de todo esto, la opinión de conformidad señala insistentemente que el propósito de la ley es proteger la integridad familiar. Luego de citar en su totalidad la polí-tica pública de la ley, establecida en su Artículo 1.2, y de reconocer que “es evidente que esta se fundamenta en el sentido máximo de proteger la vida, la seguridad y la dig- *258 nidad de los hombres y las mujeres”,(26) la opinión indica que, como en esos párrafos también se habla de la impor-tancia del núcleo familiar, se deben interpretar las dispo-siciones de la Ley 54 con el fin de fortalecer la familia como institución y amparar solo a quienes constituyen uniones legales entre hombres y mujeres.(27) Pero repetir en múlti-ples ocasiones esa pretensión y resaltar la mención de la palabra familia en la Ley y en nuestra jurisprudencia no transforma la política pública de la Ley 54 de una centrada en la eliminación de la violencia entre parejas a una enfo-cada en la unión familiar. Además, cabe preguntarse qué unión familiar o qué tipo de familia es la que la opinión de conformidad pretende proteger. ¿La que conforman una mujer y su agresor por el hecho de estar casados o poderse casar? ¿Realmente hay familia que proteger en una rela-ción de violencia? ¿Y qué hay de un niño que nace o puede nacer de una relación extramarital; acaso no forma parte de una familia? Entonces, ¿por qué no merece protección la madre o futura madre de ese niño cuando su pareja dentro de la relación consensual adúltera la agrede?
Los ensayos de hermenéutica de la opinión de conformi-dad no pueden cambiar el propósito esencial de la Ley 54, expuesto diáfanamente como sigue:
El Gobierno de Puerto Rico se reafirma en su compromiso constitucional de proteger la vida, la seguridad y la dignidad de hombres y mujeres. Además, reconoce que la violencia do-méstica atenta contra la integridad misma de la familia y de sus miembros y constituye una seria amenaza a la estabilidad y a la preservación de la convivencia civilizada de nuestro pueblo.
Como política pública, el Gobierno de Puerto Rico repudia enérgicamente la violencia doméstica por ser contraria a los valores de paz, dignidad y respeto que este pueblo quiere man- *259 tener para los individuos, las familias y la comunidad en general.(28)
Es claro que la protección de “la vida, la seguridad y la dignidad” de las personas que forman parte de la relación de pareja es el fin primordial de esta legislación. La pre-servación de la convivencia, no solo de los miembros de cada familia sino de la sociedad en general y de todos los individuos que la componen, es una consecuencia lógica del control de la violencia de pareja; es un objetivo general e incidental al propósito principal y específico de la Ley 54. La ley no propone mantener los valores de paz, dignidad y respeto solo para ciertos tipos de parejas o para quienes encajan en determinado molde de familia; son principios que desea que imperen para el beneficio de todas las per-sonas que conviven en nuestro país.(29)
B. La necesidad de una ley especial
Debemos recordar que las leyes penales especiales se crean cuando los estatutos penales tradicionales han de-mostrado no ser suficientes para garantizar la protección del bien jurídico que la sociedad interesa resguardar. El historial legislativo de la Ley 54 refleja que esta fue necesa-ria porque las leyes existentes no proveían un remedio ade-cuado para atender las características particulares del maltrato entre pareja. (30) Por eso, llama la atención que la opinión de conformidad despache el problema de la peiju-dicada con mencionar que esta no queda desprovista de *260 remedios, ya que puede utilizar la orden de protección contra el acecho y el Ministerio Fiscal cuenta con las disposi-ciones generales del Código Penal para reiniciar el proceso contra el agresor.(31)
La realidad es que la violencia o maltrato de pareja tiene unas cualidades especiales que la diferencian de otros tipos de agresión. Se requiere un trato jurídico especial precisamente porque, dadas la naturaleza de la rela-ción de pareja y las necesidades que presenta la víctima, los estatutos generales no amparan al bien jurídico prote-gido por la Ley 54.(32)
Cuando hay maltrato entre pareja, por definición, la perjudicada está ligada íntimamente a su agresor y, por consiguiente, se presentan unas consecuencias emociona-les y psicológicas particulares que no están presentes cuando hay una pelea entre desconocidos e, incluso, entre amigos.(33) En la violencia entre pareja, la víctima está en una posición especialmente vulnerable.(34) Sufre el riesgo de episodios recurrentes de violencia física, psicológica y sexual.(35)
Más aún, los incidentes de violencia tienden a escalar en frecuencia y severidad a través del tiempo.(36) La víc- *261 tima puede temer a las amenazas de que, si delata la vio-lencia, ésta pueda agravarse o costarle la vida a ella o a un ser querido.(37)
Por otra parte, cuando se acaba la relación de intimi-dad, también es frecuente la violencia, el acoso y la humi-llación, porque el agresor no acepta el fin del compromiso o está inconforme con otros efectos de la separación. (38) El ofensor se ve amenazado en su poder de dominación y, por ello, arremete contra quien ve como rebelde y desafiante.
Hay que añadir a este escenario el silencio de la víc-tima, que en múltiples ocasiones tarda en informar los ac-tos de violencia, así como la indiferencia de las personas externas a la relación, quienes no los notifican a las auto-ridades porque no quieren involucrarse en problemas “en-tre marido y mujer” o porque piensan que ese tipo de vio-lencia es “normal”. (39)
El silencio de la perjudicada y la tardanza en denunciar a su agresor se debe, muchas veces, a que entre ellos existe una relación sentimental de afecto. (40) En el caso de las *262 mujeres que se ven involucradas en relaciones adulterinas, la vulnerabilidad es aún mayor, porque su silencio no res-ponde solamente al cariño que pueda tenerle a su compa-ñero consensual, sino también al miedo de que su esposo y su comunidad se enteren de su acto de infidelidad, lo que podría conllevar desde la condena y exclusión social hasta episodios de violencia doméstica en su hogar. La mujer adúltera que sufre agresiones por parte de su amante puede ser objeto de amenazas de ser delatada si denuncia la violencia de pareja. Si logra superar esa coacción para escapar de la relación violenta, se enfrenta a la recrimina-ción social. En ese momento, si no se le proveen medidas de protección adecuadas, se le expone a un doble peligro: la reprimenda por haber sido infiel y la venganza de su amante por denunciar el maltrato.
En distintos tipos de relaciones, factores como la depen-dencia económica también pueden provocar que la víctima no delate a quien la maltratad(41) Las investigaciones socio-lógicas sobre el problema revelan que muchas veces la víc-tima duda separarse del agresor, no porque sea maso-quista, sino porque tiene miedo de no poder alimentarse ni proveerle a los suyos los bienes necesarios para su subsistencia(42) Esto va unido al temor de que el sistema de justicia no pueda socorrerla y que su denuncia solo sirva para recrudecer el maltrato.(43)
Por estas y otras razones, los científicos han identificado la naturaleza cíclica de la violencia en la relación de pareja.(44) Las tres etapas de este patrón de dominación *263 son claras y perceptibles.(45) La primera es la etapa de ten-sión, en la cual se pueden observar maltratos menores tanto a la víctima como a objetos, sujetos o animales que ella quiere y valora. En la segunda etapa, que es la de agresión, ocurren las peores golpizas o ataques emocionales. La tercera y última es la etapa de reconcilia-ción, en la cual el agresor se torna amoroso y muestra arrepentimiento. Entonces, la víctima perdona, a su compa-ñero y confía en que todo va a cambiar, solamente para comenzar el ciclo de nuevo, cuando el maltratante sienta la necesidad de hacer patente su dominio sobre ella.
Esa raíz de estas consideraciones, que particularizan la violencia en el ámbito de una relación de pareja y la dis-tinguen de otras instancias de violencia, que se decidió ti-pificar este tipo de violencia en una ley especial, separada del delito de agresión del Código Penal.
C. El delito de maltrato de pareja tipificado en el Artículo 3.1 de la Ley 54
El delito de maltrato tipificado en el Artículo 3.1 de la Ley 54 es más específico respecto a la conducta prohibida que el delito de agresión tipificado en el Código Penal. Este artículo dispone como sigue:
Toda persona que empleare fuerza física o violencia psicoló-gica, intimidación o persecución en la persona de su cónyuge, ex cónyuge o la persona con quien cohabita o haya cohabitado, o la persona con quien sostuviere o haya sostenido una rela-ción consensual, o la persona con quien haya procreado un hijo o hija, para causarle daño físico a su persona, a los bienes apreciados por ésta, excepto aquéllos que pertenecen privati-vamente al ofensor, o a la persona de otro o para causarle grave daño emocional, incurrirá en delito grave de cuarto grado en su mitad superior.
*264 El tribunal podrá imponer la pena de restitución, además de la pena de reclusión establecida.(46)
En primer lugar, a diferencia del delito de agresión, el artículo citado equipara la violencia física a la psicológica, como también a la intimidación o persecución.(47) Reconoce así que el maltrato de pareja es producto de un proceso recurrente y escalonado en la severidad de la agresión.(48) Es decir, que las agresiones psicológicas son comúnmente el preámbulo de una agresión física o hasta de un homicidio. Por otro lado, además de reconocer la violencia física, que es la forma de maltrato de pareja más visible,(49) atiende la gravedad de los abusos emocionales en las rela-ciones de pareja, que, según se ha documentado, se “pare-cen mucho a las torturas que sufren los rehenes, que tam-bién están privados de toda libertad e incluso del sueño, sin saber cuándo les caerá encima el próximo golpe”.(50)
En segundo término, el Artículo 3.1 de la Ley 54 supra, identifica como sujeto pasivo del delito de maltrato, no sólo al cónyuge y al excónyuge, sino también a las personas que cohabitan o han cohabitado con el agresor, las que sostie-nen o han sostenido una relación consensual íntima con este y las personas con quienes este tiene hijos o hijas en común.(51) Es importante señalar que la definición de “rela- *265 ción de pareja”, recogida en el Artículo 1.3 de la Ley 54, supra, identifica a esos mismos sujetos.(52) Cada una de estas categorías debe tener una definición propia, porque, de lo contrario, no tendría sentido enumerarlas como con-ceptos separados. Las figuras del cónyuge y el excónyuge se refieren lógicamente a la institución del matrimonio. La persona con quien se ha procreado un hijo está identificada con la paternidad y la maternidad. El concepto cohabitar, por otra parte, está definido por la propia ley e implica “sostener una relación similar a la de los cónyuges”.(53)
Entonces, hay que concluir que, para tener un campo de acción independiente, el término “relación consensual” se tiene que referir a una relación que no sea similar a la de los cónyuges. Para propósitos de la ley, existe una relación consensual cuando hay un trato de carácter amoroso entre dos o más personas aceptado voluntariamente por estas, es decir, consentido, sin que necesariamente habiten o hayan habitado juntos, ni se hayan casado o procreado hijos en común.(54) No podemos concebir, como sugiere la opinión de conformidad, que el término “relación consensual” se re-fiera únicamente a novios que no viven juntos, que pueden tener hijos en común y casarse eventualmente, porque de esa forma la definición se acerca más a la de una familia.(55) No puede dejar de preocuparnos el que los fun-damentos filosóficos de este análisis se asemejen tanto a los que justificaron en su momento el sistema de clasifica-ciones de los hijos como legítimos, ilegítimos o naturales según el estatus matrimonial o “matrimoniable” de los padres, antes de la adopción de la Constitución de Puerto Rico, que decretó la igualdad de las personas y repudió el *266 discrimen por razón de nacimiento.(56) Por eso, hoy resue-nan nuevamente las sabias palabras del juez Hernández Matos en Ocasio v. Díaz: “No debemos perdernos en el la-berinto de las injustas distinciones.”(57)
Como señalamos anteriormente, la política pública que inspira la Ley Núm. 54 no se basa en la protección de la integridad familiar, sino en la de la vida y seguridad de todas las personas que son parte de una relación de pareja. Por lo tanto, la interpretación lógica del término tiene que referirnos a todas las parejas que se encuentran voluntaria-mente en una relación amorosa y que no pueden ubicarse dentro de las demás categorías por no estar casados o divorciados, no tener hijos en común o no haber residido juntos. Si la propia ley define “cohabitar” como “sostener una relación consensual similar a la de los cónyuges”, no puede definirse “relación consensual” de la misma forma, como una relación que suele convertirse en matrimonio. De ser así, no hubiese sido necesario crear una categoría separada.
Bien advierte la opinión de conformidad que aclarar el alcance de una disposición estatutaria “no significa que po-demos darle a una ley un significado más limitado al que usualmente tiene dentro de la realidad social”.(58) No pode-mos ocultar que las relaciones consensúales extramarita-les, independientemente de lo que pensemos sobre estas, son parte de nuestra realidad cotidiana y una porción considerable de nuestra población es producto de las mismas.(59)
*267 El término “relación consensual” no estaba incluido en los proyectos de ley que precedieron a la versión que final-mente prevaleció, sino que fue añadido al proyecto sustitu-tivo luego de que se celebraran vistas públicas y antes de la aprobación final del estatuto. Así, el que se añadiera el concepto de “relación consensual” denota la clara intención de los legisladores de extender el ámbito de la ley para proteger a todas aquellas víctimas que, sin tener una rela-ción similar a la de los cónyuges, son especialmente vulne-rables a sufrir ciclos de violencia de parte de su compañero o compañera.
Finalmente, el tercer elemento del delito de maltrato es que la agresión esté dirigida a causar grave daño físico o emocional a la víctima, a sus bienes o a otra persona. En este punto debemos resaltar que, en Pueblo v. Figueroa Santana, 154 D.P.R. 717 (2001), este Tribunal resolvió que no se requiere probar, como elemento del delito de maltrato bajo esta sección, que la persona acusada ha incurrido en un patrón constante de fuerza física en contra de la víctima.(60)
D. Otros mecanismos o remedios provistos en la Ley 54 para proteger a las víctimas de maltrato de pareja
Con el propósito de atender la situación de violencia de pareja de manera integral, la Ley 54 también adoptó otros mecanismos o remedios para proteger a las víctimas. Estas herramientas no necesariamente están disponibles para los perjudicados de otros tipos de delitos.
Entre estos mecanismos está el remedio civil de la orden de protección, establecido en el Artículo 2.1 de la Ley 54 en los términos siguientes: “Cualquier persona que haya sido víctima de violencia doméstica ... en el contexto de una relación de pareja, podrá ... solicitar una orden de *268 protección.”(61) Se trata de un instrumento que tiene la víc-tima de la violencia de pareja para alejar a su agresor y organizar otros asuntos relacionados, como la custodia de menores y las relaciones paterno-filiales.(62)
Este tipo de orden de protección fue concebida para atender las características particulares de la violencia de pareja y por ello se distingue de la orden de protección contra el acecho provista en nuestro ordenamiento. Esta se concede cuando hay un patrón de conducta repetida o cons-tante de vigilancia, proximidad física o visual, amenazas, vandalismo u hostigamiento contra una persona.(63) Como podemos notar, para obtener una orden de protección contra el acecho se requiere un patrón de conducta repetida o constante, mientras que para que se conceda una orden de protección contra la violencia de pareja es suficiente pro-bar un incidente de agresión física o emocional. Con toda probabilidad, los legisladores actuaron conscientes de que, en la violencia de pareja, la integridad física de la víctima, e incluso su vida, puede estar en peligro si se espera hasta el próximo incidente.
Otra de las medidas protectoras adoptadas en la Ley 54 obliga al oficial del orden público a tomar todos los pasos necesarios para prevenir que el abuso se repita. Entre otros, puede arrestar al imputado, aun sin orden judicial, cuando tenga fundamentos para creer que se ha violado la Ley 54, aunque el crimen no haya ocurrido en su presencia y sin importar si el delito es grave o menos grave.(64) Dis-tinto a esto, la Regla 11 de Procedimiento Criminal, que aplica en todos los demás casos, requiere que en caso de delito menos grave el policía haya presenciado el compor- *269 tamiento ilegal u obtenido una orden judicial antes de arrestar al sospechoso.(65) Dado el peligro en que general-mente se encuentra la víctima de violencia doméstica, a diferencia del perjudicado de un delito aislado de agresión, el que el agente del orden público pueda intervenir con el denunciado inmediatamente evita que se desencadene mayor violencia o que se susciten consecuencias fatales.(66) Claramente, la Legislatura entendió que el arresto de la persona que maltrata, tan pronto se manifiesta la violen-cia, es la medida más eficaz para proteger a la víctima y disuadir al agresor.(67)
Por último, el policía que atiende una denuncia de vio-lencia entre una pareja debe informar a la denunciante sobre los servicios sociales disponibles y, si ésta expresa preocupación por su seguridad, transportarla a un lugar seguro. (68) También se requiere que los oficiales del orden público llenen un informe escrito sobre todos los incidentes de violencia entre pareja, independientemente de que no se presenten cargos.(69) No hay tal requisito en otros casos en los que se denuncien hechos presuntamente ilegales. Todas estas protecciones para la víctima de violencia doméstica evidencian que la Asamblea Legislativa reconoció el carác-ter particular de este delito y por ello lo tipificó en una ley distinta al Código Penal.
E. Procedimiento de desvío
Es significativo que cuando único se hace referencia a la relación de tipo adúltera en todo este andamiaje normativo de rechazo a la violencia de pareja es en la porción de la ley dedicada a establecer y regular el procedimiento de *270 desvío. Este procedimiento, que tan solo se da luego de una convicción, permite que el convicto de violencia de pareja se someta a un régimen de libertad a prueba, sujeto a su participación en un programa de reeducación y readiestra-miento para personas que incurren en conducta agresiva en la relación de pareja.(70)
El Artículo 3.6 de la Ley 54 otorga al juez de instancia discreción para “suspender todo procedimiento y someter a la persona convicta a libertad a prueba”, en situaciones específicas.(71) Entre estas, cuando la persona haya sido convicta por el delito de agresión sexual, bajo el Artículo 3.5 de la Ley 54,(72) “el desvío del procedimiento sólo estará disponible para los casos en que el acusado sea el cónyuge o cohabite con la víctima al momento de la agresión sexual, siempre y cuando dicha cohabitación no sea adúl-tera ...”.(73)
La única referencia a las relaciones adúlteras en toda la Ley 54 se da, pues, en el contexto de la concesión de un beneficio al agresor que es convicto. Evidentemente, el le-gislador reconoció que la violencia de pareja penalizada por la ley podía suceder en una relación adulterina, pero no quiso beneficiar con el privilegio de desvío a un agresor convicto que sostuvo con la víctima una relación de ese tipo.
Si las disposiciones de la Ley 54 no aplicaran a las rela- *271 dones adulterinas, como concluye la opinión de conformi-dad, no sería necesario especificar que no puede otorgarse el beneficio del procedimiento de desvío al adúltero convicto. De esta intención de no favorecer a un acusado que es convicto no podemos extrapolar una intención de perjudicar a su víctima negándole la protección de la Ley 54. En otras palabras, el que se niegue un beneficio al vic-timario no puede conllevar negarle derechos a su víctima. De otro lado, no escapa nuestro análisis el que la decisión de excluir a las parejas adúlteras del alcance de la Ley realmente favorece al victimario que maltrata a su pare-ja,(74) sobre quien se tiende, por efecto de la determinación que se está confirmando, un manto de impunidad.(75)
No se trata, como aduce la opinión de conformidad, de crear elementos del delito por analogía, en contravención al principio de legalidad. Más bien, como hemos explicado, del texto de la ley se desprende que el estatuto aplica a las relaciones consensúales en las que se pueda dar la violen-cia de pareja, y estas incluyen las relaciones adúlteras. No estamos proponiendo cambiar la definición de pareja de la ley para incluir relaciones que no están protegidas.(76) Es la propia Ley 54 la que contiene las relaciones consensúales presentes y pasadas en su enumeración, sin referencia al estado matrimonial de las partes.
III
Tras evaluar la conducta típica prohibida por el delito de maltrato y las demás disposiciones de la Ley 54, conclui-mos que el bien jurídico protegido por el delito de maltrato *272 es la integridad física y psíquica de la víctima. Según de-muestra el historial legislativo y la declaración de política pública de este estatuto especial, su propósito principal es proteger a la víctima de ese tipo de agresión; específica-mente, "preservar su integridad física y emocional, procu-rar su seguridad y salvar su vida”.(77) La razón para ello, como hemos expresado, es que las leyes penales tradicio-nales no protegían adecuadamente a la víctima de mal-trato de pareja, que es más vulnerable a la reincidencia de la violencia, al aumento escalonado en severidad y a unas consecuencias psíquicas y sociales más brutales que las que sufre el perjudicado o perjudicada por la agresión se-gún tipificada en el Código Penal.(78)
Sin duda, el legislador tomó en consideración que el maltrato en el seno de una pareja, o entre quienes fueron una pareja, es más difícil de identificar e incluso de probar en un tribunal, muchas veces por la resistencia que tienen sus víctimas a reconocer las implicaciones y el carácter de-lictivo de este tipo de violencia y por nuestra cultura que, aún en nuestros tiempos, la remite al ámbito de lo privado.(79)
*273 Abona a nuestra conclusión la claridad con la que la Ley 54 establece que aplica a personas que sostienen o han sostenido una relación consensual, independientemente de su estatus civil. Esta ley no se limita a prohibir el maltrato conyugal, como lo hicieron algunos de los proyectos que le antecedieron.(80) Por el contrario, el estatuto es expresa-mente aplicable a víctimas y agresores que tienen una re-lación íntima consensual o de convivencia. También cobija a aquellos cuya única relación fue tener un hijo en común. La diversidad de situaciones a las que aplica la ley refuerza nuestra apreciación de que, más que promover o proteger un tipo de relación particular, la Ley 54 protege la integri-dad de la víctima que se encuentra en un particular estado de indefensión y susceptibilidad. Una mujer adúltera sufre lo mismo que el resto de las mujeres que son víctimas de violencia por parte de sus parejas. Profesionales de la con-ducta humana explican que “[e]ste ambiente de terror y de miedo lo pueden experimentar independientemente de si su matrimonio es legalmente validado o de si es consensual, o si es la amante de un hombre especí-fico”.(81)
Si entendiéramos, como lo hizo el tribunal intermedio apelativo y lo hacen los miembros de este Tribunal que suscriben la opinión de conformidad, que la Ley 54 no aplica a los miembros de una pareja consensual adúltera porque el adulterio es ilegal, tendríamos que concluir que ese estatuto tampoco protege a la víctima de una agresión *274 a manos de la persona con quien tuvo un hijo si el hijo fue fruto de una relación adúltera. Tampoco protegería a quien haya convivido o conviva con su agresor si uno de ellos está casado legalmente con otra persona, ni a quien hubiera puesto fin a una relación adúltera y fuera atacada por esa expareja consensual. Resulta irrazonable que la ley ex-ponga claramente que aplica a quienes cohabitan y este Tribunal exceptúe a quienes conviven con un amante; que la ley disponga que aplica a quienes han procreado hijos en común y este Tribunal exceptúe a quienes tuvieron ese hijo con una persona casada; que la ley establezca indiscutible-mente que aplica a personas que hayan tenido o mantengan una relación consensual y este Tribunal exceptúe a quienes incurren en adulterio en esa relación consensual. Se trata, pues, de una interpretación contraria a la intención legis-lativa que no encuentra apoyo en el texto de la ley ni en su historial.
La opinión de conformidad argumenta que la intención legislativa al incluir la frase “relación consensual” no fue abarcar uniones como las adulterinas. Se basa en que, en el contexto penal, la Asamblea Legislativa ha decidido mantener el adulterio como un delito, a pesar de haber tenido oportunidades para seguir la tendencia moderna de suprimirlo. Su lógica enuncia que no es posible que la misma Asamblea Legislativa que busca combatir el adulte-rio por entender que es un mal social proteja la integridad física y emocional de alguien que ha participado en una relación adúltera.(82) El problema de ese razonamiento es que parte de la premisa errada de que se está tratando de proteger, y con ello condonar, una ilegalidad, cuando lo que se está intentando proteger es el bien jurídico de mayor je-rarquía: la vida(83)
*275 Además, el propósito del Estado al enjuiciar al agresor al amparo de la Ley 54 es prevenir el crimen y proteger a las víctimas, no juzgarlas por otro comportamiento del cual no han sido acusadas. El enfoque moderno en el campo penal no favorece que se realicen juicios valorativos sobre la moralidad de las víctimas.(84)
Es absurdo pensar que no se pueda cometer un crimen sobre una persona porque esta posiblemente cometió otro delito. Es igualmente absurdo pensar que una persona pierde el derecho a todos los remedios y las protecciones que le otorgan las leyes solo porque posiblemente participó en un acto que está sancionado por alguna ley. Desproteger a una víctima de violencia de pareja porque ha sido infiel se asienta en ese absurdo.
Es evidente que la interpretación que propone la opi-nión de conformidad dejaría desprotegidas a cientos o miles de mujeres que, si bien son adúlteras, son tan suscep-tibles o vulnerables como una esposa o una novia a la agresión física o psíquica del maltrato de pareja. Nuestra labor como foro de justicia no es emitir opiniones en el abstracto. Tenemos que analizar y reconocer las conse-cuencias de nuestras decisiones.
En este contexto, es meritorio resaltar que, en los últi-mos 10 años, más de 250 mujeres han sido asesinadas por sus compañeros consensúales o sus exparejas en Puerto Rico y que nuestro país ocupa el puesto número 12 respecto a asesinatos por violencia de pareja per cápita y el número 5 en prevalencia del problema de violencia machista entre las naciones del mundo.(85) Las estadísticas de la Policía de
*276 Puerto Rico reflejan que cada año se reportan entre 17,000 y 23,000 incidentes de violencia doméstica. En el 2008, mu-rieron 26 mujeres en sucesos de violencia machista; en el 2009, murieron 16, y en el 2010, murieron 19.(86) Cualquier persona atenta a la realidad que nos rodea sabe que, en tan solo los primeros tres meses de este año, 10 mujeres han sido asesinadas por sus parejas o exparejas.(87) Ante esta triste e indignante situación, la decisión de limitar la aplicación de las pocas herramientas legales con que cuen-tan las víctimas para proteger su integridad y sus vidas es profundamente decepcionante.
IV
La Ley 54 no requiere de la víctima una cualidad especial, como lo sería la fidelidad. Tampoco impone una cuali-dad especial a la relación, como lo sería la legalidad. (88) Por el contrario, el legislador quiso incluir las relaciones con- *277 sensuales dentro del ámbito protegido por el estatuto especial, porque reconoció que se trata de una realidad social moderna en la cual se pueden suscitar los incidentes de violencia que la Ley 54 pretendió atender.(89) Es impor-tante enfatizar que este estatuto protege a la persona que sufre la violencia, no a la relación constituida con su agresor.(90)
No proteger a una víctima de violencia doméstica por-que está o estuvo involucrada en una relación adúltera im-plicaría castigarla doblemente. Recibiría así el castigo de ser víctima de su agresor y el castigo de la indiferencia del *278 Estado.(91) No podemos pasar por alto que esa indiferencia a la destrucción de la integridad física y psíquica de un ser humano es contraria a nuestros principios constitu-cionales. La Carta de Derechos de la Constitución del Es-tado Libre Asociado de Puerto Rico consagra que “[l]a dig-nidad del ser humano es inviolable”, lo cual incluye el de-recho a la vida que también está reconocido expresamente.(92) La palabra “vida” se incorporó en nuestra Cons-titución para significar tanto el “hecho de continuar uno respirando” como otros derechos que son “necesarios para el debido desenvolvimiento de la personalidad humana”.(93) Así, el Estado es el responsable de proteger los derechos constitucionales de las personas y, para ello, debe ser ac-tivo y efectivo.
El Tribunal Supremo es uno de los componentes del Es-tado llamados a cumplir con ese deber de protección. No es un foro para pasar juicio sobre la moralidad de la conducta de los ciudadanos y las ciudadanas. En palabras de la Prof. Ivette Ramos Buonomo: “La obligación de los jueces del Tribunal Supremo es definir la libertad de todos, hacer res-petar los derechos fundamentales de todos. Ello no incluye imponer su propio código de moralidad.”(94)
Y si fuéramos a entrar en consideraciones morales, ten-dríamos que concluir que lo inmoral sería abandonar a una persona afligida por la violencia de su pareja. No podemos, en un afán de promover una visión de lo que consideramos que debe ser el comportamiento adecuado, negarle protec-ción a una persona que ve en peligro su seguridad y su *279 vida. No debemos enclaustrarnos en categorías absolutas del bien y el mal para condenar todo lo que no se ajuste a nuestra visión de lo que es correcto.(95) El adulterio, inde-pendientemente de nuestro criterio moral, no puede ser la razón por la cual le neguemos a una mujer los remedios que la legislación ha dispuesto para ayudarla a salvarse de una pareja que le hace daño. Hacerlo constituiría un atro-pello a un valor mucho más poderoso en nuestro ordena-miento jurídico y en nuestros cimientos como sociedad: el respeto a la vida humana.
V
El señor Flores Flores aceptó que entre él y la señora Romero Pérez hubo una relación consensual de “novios”, que incluyó relaciones sexuales por aproximadamente diez meses. El que la perjudicada estuviera casada con otro hombre al mismo tiempo no afecta el hecho de que mante-nía una relación consensual con el recurrido. Conforme con lo aquí explicado, la relación sostenida entre el acusado y la perjudicada está incluida tanto en la definición de “pa-reja” del Artículo 1.3 de la Ley 54, como en el Artículo 3.1 del mismo estatuto, supra, que tipifica el delito de maltrato dentro de una “relación consensual”. Por lo tanto, lo co-rrecto debió haber sido resolver que la determinación de causa probable se hizo conforme a la ley y al derecho. Esa decisión hubiese sido cónsona con el texto y el espíritu de la Ley para la Prevención e Intervención con la Violencia Doméstica.
La política pública contenida en la Ley 54 expresa que: “Las ideas, actitudes y conductas discriminatorias también permean las instituciones sociales llamadas a resolver y a prevenir el problema de la violencia doméstica y sus *280 consecuencias.”(96) El Tribunal Supremo no puede ser una de esas instituciones. Sin embargo, con decisiones como la que algunos miembros de este Foro avalan hoy, nuestro sistema de justicia se hace cómplice de la violencia de pa-reja que tantas vidas está destruyendo en Puerto Rico. Como me niego a ser partícipe en esta injusticia, disiento.
Voto de inhibición emitido por el Juez Asociado Señor Rivera García.
En el recurso de referencia el Juez suscribiente parti-cipó directamente en calidad de Juez Superior en el Tribunal de Primera Instancia. En el foro primario se emitió una resolución que declaró “no ha lugar” una solicitud de des-estimación presentada al amparo de la Regla 64(p) de Pro-cedimiento Criminal, 34 L.P.R.A. Ap. II.
El dictamen emitido en ese entonces estuvo fundamen-tado en el criterio de ausencia total de prueba necesario para demostrar que la determinación de causa probable no fue con arreglo a la ley y al derecho. Es decir, solo ante la carencia total de prueba sobre la probabilidad de que estén presentes y probados uno, varios o todos los elementos del delito imputado o la conexión del imputado con tal delito, procede decretar la desestimación de la acusación presentada contra el solicitante. Pueblo Rodríguez Ríos, 136 D.P.R. 685 (1994); Pueblo Rivera Alicea, 125 D.P.R. 37 (1989). Al evaluar la prueba de cargo y la defensa vertida durante la vista de desestimación, colegimos que el acu-sado incumplió con el referido criterio.
Como es sabido, la Regla 63 de Procedimiento Civil, 32 L.P.R.A. Ap. V, al igual que los Cánones de Etica Judicial exigen que el juez no solamente ha de ser imparcial, sino que su conducta ha de excluir toda posible apariencia de *281 parcialidad. Es por ello que los criterios de imparcialidad y objetividad que rigen la función judicial son de tal trascen-dencia que nuestro ordenamiento jurídico exige que en cualquier causa que tienda a minar la confianza pública o razonablemente arrojar dudas sobre la imparcialidad para adjudicar, el juez deberá inhibirse de actuar en el pleito o procedimiento.
A la luz de las circunstancias esbozadas y en considera-ción a los imperativos éticos, nos inhibimos de entrar a evaluar los méritos del presente caso.

 C. Fourier, Teoría de los cuatro movimientos y de los destinos generales, Barcelona, Ed. Barral, 1974, pág. 167.

 Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989 (8 L.P.R.A. sees. 601-664).

 Art. 3.1 de la Ley para la Prevención e Intervención con la Violencia Doméstica, Ley Núm. 54 de 15 de agosto de 1989 (8 L.P.R.A. see. 631).

 La violencia doméstica también se conoce como “violencia machista”. En algunos países, se ha denominado “terrorismo sexual”. C.J. Sheffield, “Sexual Terrorism”, en L.L. O’Toole y J.R. Schiffman, Gender Violence: Interdisciplinary Perspectives, 2da ed., Nueva York, NYU Press, 1997, pág. 111.

 34 L.P.R.A. Ap. II.

 El Juez Asociado Señor Rivera García, quien, como juez superior, dictó la resolución revocada por el Tribunal de Apelaciones, se inhibió.

 Véase el P. del S. 1197 del cuatrienio de 1981-1984, que proponía añadir el Artículo 95-A al Código Penal para tipificar el delito de maltrato conyugal, y los Proyectos del Senado 497 y 1140 del cuatrienio 1985-1988.

 En 1989, la senadora Velda González también presentó el Proyecto del Se-nado 91, relacionado con el mismo asunto.

 N. Castelló Nicás, “Problemática sobre la concreción del bien jurídico prote-gido”, en A. García Vitoria y C. Aránguez Sánchez, Estudios penales sobre la violen-cia doméstica, Madrid, Ed. Edersa, 2006. Este concepto del “bien jurídico” se refiere al interés protegido por la norma penal y, por tal razón, es de gran importancia a lo largo de la historia moderna del derecho penal.

 J.A. Lascuraín Sánchez, Bien jurídico y objeto protegible, 60 Anuario de Derecho Penal y Ciencias Penales 119, 125-126 (enero de 2007). “El vocablo ‘bien’ hace referencia al objeto de una valoración positiva y el adjetivo jurídico’ que le acompaña alude al sujeto y a la forma de dicho juicio.” Id., pág. 123.

 íd., págs. 126-127.

 íd., pág. 127.

 íd. Una vez identificado el bien jurídico, éste, “en un viaje de vuelta ... precisa los contornos de la norma” penal. íd., pág. 128.

 C. Ganzenmüller Roig y otros, La violencia doméstica: regulación legal y análisis sociológico y multidisciplinar, Barcelona, Bosh, 1999, pág. 14-15.

 Véase el Artículo 1.3(m) de la Ley 54 (8 L.P.R.A. sec. 602(m)). Le damos énfasis a que esta ley aplica a situaciones en las cuales ya no existe la relación afectiva íntima.

 Véanse las secciones segunda y tercera del Código Penal de Puerto Rico de 2004, que regulan la protección debida a los menores y a las personas de edad avan-zada, respectivamente. 33 L.P.R.A. secs. 4759-4767. Otras leyes que protegen a estas personas, consideradas débiles dentro de la relación social, son La Carta de Derechos de la Persona de Edad Avanzada, Ley Núm. 121 de 12 de julio de 1986, y la Ley para el Bienestar y la Protección Integral de la Niñez, Ley Núm. 177 de í de agosto de 2003.

 Informe Conjunto de las Comisiones de lo Jurídico, de Desarrollo Cultural y de Asuntos de la Mujer, Diario de Sesiones, Procedimientos y Debates de la Asam-blea Legislativa del lunes 26 de junio de 1989, Núm. 66 (Informe Conjunto), págs. 2289-2290; E. Vicente, Beyond Law Reform: The Puerto Rican Experience in the Construction and Implementation of the Domestic Violence Act, 68 (Núm. 3) Rev. Jur. U.P.R. 553, 580-581 (1999). No cabe duda que las mujeres siguen siendo las princi-pales víctimas de este problema social. Basta mirar la prensa diaria de nuestro país para concluir que éstas son las que mayormente padecen este mal.

 Art. 1.2 de la Ley 54 (8 L.P.R.A. see. 601). Ciertamente, la Ley 54 tenía objetivos adicionales, como tipificar y prevenir la violencia en las relaciones de pareja y rehabilitar a los agresores. También se interesaba que las autoridades del orden público fueran responsables e intervinieran eficazmente en el arresto del agresor, la protección de la víctima y la recopilación de la información relativa a los incidentes de este tipo de violencia. Informe Conjunto, supra.

 Pueblo v. Ruiz, 159 D.P.R. 194 (2003). A pesar de que el maltrato contra las mujeres era el principal problema que dominó el proceso legislativo de la Ley 54, el proyecto terminó aprobándose con un lenguaje neutral en cuanto al hombre y la mujer. Reconociendo esta realidad, en Pueblo v. Figueroa Santana, 154 D.P.R. 717, 724 (2001), indicamos que, aunque en su aplicación la Ley 54 generalmente protege *256 a las mujeres víctimas de maltrato, se creó también para proteger a los hombres “que, en ocasiones, también son víctimas silentes de este triste drama”.

 Ponencia de la Organización Puertorriqueña de la Mujer Trabajadora (OPMT) en torno al Proyecto 470 del Senado y 615 de la Cámara de Representantes sobre Violencia Doméstica (Ponencia OPMT), pág. 4. En ésta se hace énfasis en la importancia de que se tipifique el delito de maltrato para “ayudar a combatir la visión de que la agresión no es algo tan malo cuando se comete contra la mujer, dentro de la familia”. Véase M. Comas d’Argemir i Cendra, “Poder Judicial y Violen-cia Doméstica, ¿Qué hemos logrado? ¿Qué debemos lograr?”, en I. Tena Franco, La violencia doméstica: su enfoque en España y en el derecho comparado, Madrid, Con-sejo General del Poder Judicial, 2005, págs. 15-16. Véase, además, el Informe sobre el Discrimen por Razón de Género en los Tribunales de Puerto Rico, Puerto Rico, Tribunal Supremo, Comisión Judicial Especial para Investigar el Discrimen por Gé-nero en los Tribunales de Puerto Rico, agosto 1995 (Informe sobre Discrimen en Tribunales), pág. 322.

 Véase R.S. Bonilla, Ay! Ay! Amor: no me quieras tanto (El marco social de la violencia contra las mujeres en la vida conyugal), Centro de Investigaciones Sociales de la Universidad de Puerto Rico, Centro Coordinador de Estudios, Recursos y Ser-vicios a la Mujer (CERES), 1985; Comas d’Argemir i Cendra, supra, pág. 19; Ganz-enmüller Roig, supra, pág. 15. Véase, además, Informe sobre Discrimen en Tribuna-les, supra, pág. 318. En Pueblo v. Ruiz, supra, págs. 204-205, indicamos que el objetivo de la Ley 54 es “consustancial con el propósito de liberar a [las mujeres] de las desventajas que supone su rol tradicional en el sistema social del patriarcado, el cual las relega a un rol secundario y pasivo dentro de la relación de pareja”. (Escolio omitido.)

 Ponencia OPMT, supra. La OPMT explica que la legislación puede aliviar el problema de que las autoridades se nieguen a tramitar o desalienten las querellas de las mujeres contra la pareja que las maltrata. Véase, además, R.M. Silva Bonilla y *257 otras, Hay amores que matan: la violencia contra las mujeres en la vida conyugal, Río Piedras, Ediciones Huracán, 1990, pág. 63.

 8 L.P.R.A. sec. 601.

 Véanse el Memorial Explicativo del P. de la C. 615 y el P. del S. 470 (Memorial Explicativo), págs. 2-3; la Exposición de Motivos del Proyecto Sustitutivo al P. del S. 90 y al P. del S. 470, págs. 1-2, y la Ponencia de la Comisión para los Asuntos de la Mujer, Oficina del Gobernador, para el P. del S. 470, págs. 2-3.

 Silva Bonilla y otras, op. cit., pág. 61.

 Opinión de conformidad, pág. 238. Más adelante en la opinión se vuelve a reconocer que “la Ley Núm. 54 está enfocada en la víctima ...”. Id., pág. 245.

 íd., págs. 237-240.

 8 L.P.R.A. sec. 601.

 La opinión de conformidad asevera que las reglas de interpretación, y espe-cíficamente la que ordena que los estatutos penales que desfavorecen a los acusados se interpreten restrictivamente, no pueden utilizarse para menoscabar la intención legislativa. Opinión de conformidad, pág. 234, citando a Pueblo v. Figueroa Pomales, 172 D.P.R. 403 (2007). No obstante, ignora el propósito evidente de la Ley 54, in-vierte el orden de prioridades de la legislación y propone su propia interpretación a favor de la integridad familiar, como alternativa al fin indudable de proteger a las víctimas de la violencia de pareja.

 Informe Conjunto, supra, pág. 2290. Para ello, la Ley 54 combina remedios civiles y penales.

 Opinión de conformidad, pág. 247.

 Véase Memorial explicativo, supra, pág. 6.

 Véase a Castelló Nicás, op. cit, en que la profesora titular de derecho penal de la Universidad de Granada distingue la violencia entre sujetos que sostienen o sostuvieron una relación íntima y la violencia entre unos compañeros de residencia o de servicio militar.

 íd.

 Memorial Explicativo, supra, pág. 10. La Asamblea Legislativa reconoció la importancia de que las agencias encargadas provean protección a la víctima de vio-lencia de pareja “que por su naturaleza está mucho más expuesta a sufrir represalias por parte, del ofensor que la víctima de conducta delictiva proveniente de un extraño”. íd.

 La Organización Puertorriqueña de la Mujer Trabajadora lo describió de la manera siguiente en su ponencia durante el proceso de aprobación de la Ley 54: “Una mujer que sufre bofetadas y empujones hoy, mañana recibirá una paliza y más tarde una amenaza de muerte. Hoy sufre episodios de maltrato esporádicamente, mañana cada semana, finalmente diariamente o varias veces al día.” Ponencia OPMT, supra.

 Véase Castelló Nicás, op. cit., en que se indica que las mujeres víctimas de violencia doméstica son usualmente amenazadas “con recibir más violencia si toman medidas contra el agresor”.

 Id. Esta relación de expareja también se caracteriza por “la imposibilidad e incapacidad de la víctima de defenderse ante el permanente hostigamiento” del agresor. Id.

 Id.; Silva Bonilla y otras, op. cit., pág. 75. Roxana Vásquez describe la re-sistencia a identificar la violencia doméstica y reconocerse víctima de violencia de la forma siguiente: “un inmenso territorio en donde la violencia se ha instalado mejor que en ningún otro, donde por eterna, invisible o silenciada, se convierte en lo más temible. Su gravedad reside en la naturalidad con la que se asume, es tal que para muchos ni siquiera existe”. R. Vásquez Sotelo y G. Tamayo León, Violencia y legali-dad, Lima, Concytec, 1989, pág. 24.

 Los sentimientos que se producen cuando se recibe una dosis de violencia de una persona a quien se ama son muy distintos a los que se sienten cuando el agresor es un desconocido. Véanse los Comentarios de la Directora Ejecutiva de la Comisión para los Asuntos de la Mujer, Oficina del Gobernador en torno al Proyecto del Senado 470 para crear la Ley sobre la Intervención con y la Prevención de la Violencia Doméstica, pág. 10. En el primer escenario se puede tener la esperanza de que la relación mejore y ello influye en el comportamiento de la víctima; obviamente, en el segundo esto no es una consideración. La dependencia afectiva dificulta el que una mujer rompa con un ciclo de malos tratos por parte de su pareja. Silva Bonilla y otras, op. cit., págs. 65-75.

 Castelló Nicás, op. cit.

 Véase Informe sobre Discrimen en Tribunales, supra, pág. 323. El miedo a la miseria económica es uno de los factores que contribuyen, como expresa la profe-sora Silva Bonilla, a “encadenar a [la] mujer a su presente estado de vulneración personal”. Silva Bonilla y otras, op. cit., pág. 60.

 Véanse: Memorial Explicativo, supra, pág. 10; Silva Bonilla y otras, op. cit, pág. 60.

 Los científicos asemejan las prácticas de la violencia de pareja a la táctica conocida como lavado de cerebro. Es decir, se somete a la víctima a “períodos suce- *263 sivos de maltrato y de recompensas con el propósito de dominar su voluntad”. In-forme sobre Discrimen en Tribunales, supra, pág. 324.

 Ganzenmüller, supra, pág. 49.

 8 L.P.R.A. sec. 631.

 La Dra. Catherine Kirkwood, para definir abuso emocional, cita a Ginny Ni Carthy en la segunda edición de su libro Getting Free: You Can End Abuse and Take Back Your Life, que dispuso que este tipo de abuso se considera tal cuando los insultos ocasionales alcanzan un “nivel de campaña [que] reduce la autoestima de la esposa y de recurso para mantener el control”. C. Kirkwood, Cómo separarse de su pareja abusadora: desde las heridas de la supervivencia a la sabiduría para el cam-bio, Barcelona, Granica, 1999, págs. 69-70.

 Kirkwood explica cómo las mujeres que ella estudió indicaron que, con el tiempo, los ataques de su pareja “se tornaban más prolongados y crueles”. Id., pág. 67.

 Silva Bonilla y otras, op. cit, pág. 57.

60) A. Mullender, La violencia doméstica: una nueva visión de un viejo pro-blema, Barcelona, Paidós, 2000, pág. 49, citando a D.L.R. Graham y otros, “Survivors of Terror: Battered Women, Hostages and the Stockholm Syndrome”, en K. Yllo y M. Bograd, Feminist Perspectives on Wife Abuse, Newbury Park, Sage, 1988.

61) íd.

 Véanse: Artículo 1.3(m) de la Ley 54 (8 L.P.R.A. sec. 602(m)); Artículo 3.1 de la Ley 54 (8 L.P.R.A. sec. 631).

 Art. 1.3 de la Ley 54 (8 L.P.R.A. sec. 602).

 Véase la definición de consensual, como “perteneciente o relativo al consen-so”, y la de relación, en el diccionario de la Real Academia Española, http:// www.rae.es/rae.html.

 Opinión de conformidad, págs. 241-242.

 II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. Véanse los Artículos 1 a 129 del Código Civil, 31 L.P.R.A. secs. 441-508.

 Ocasio v. Díaz, 88 D.P.R. 676, 728 (1963). En este caso establecimos que un hijo es simplemente un hijo y sus progenitores su padre o madre, independiente-mente de las circunstancias del nacimiento y el estado civil de los padres.

 Opinión de conformidad, pág. 234.

 Según señaló el Prof. Miguel Velázquez hace ya 15 años, “desde hace aproxi-madamente medio siglo, el propio Tribunal Supremo comenzó a elaborar las normas jurisprudenciales que culminaron en el reconocimiento del hecho de que no se con-siderará contrario a la política pública el reconocer que existen y son inevitables las *267 uniones extramatrimoniales ...”. M. Velázquez Rivera, Derecho de Familia, 64 (Núm. 4) Rev. Jur. U.P.R. 799, 807 (1995).

 Pueblo v. Figueroa Santana, supra.

 8 L.P.R.A. see. 621.

 íd.

 Ley contra el Acecho en Puerto Rico, Ley Núm. 284 de 21 de agosto de 1999 (33 L.P.R.A. secs. 4013-4026).

 8 L.P.R.A. sec. 638.

 34 L.P.R.A. Ap. II, R.ll.

 Informe Conjunto, supra, pág. 2293.

 Véase Memorial Explicativo, supra, págs. 12-13.

 8 L.P.R.A. sec. 640.

 8 L.P.R.A. sec. 641.

 8 L.P.R.A. see. 636. El propósito de este mecanismo de rehabilitación, ade-más de los punitivos incorporados en la Ley 54, es “detener la espiral de la violencia doméstica” al cambiar el patrón de conducta y la visión sobre las relaciones humanas. Exposición de Motivos de la Ley Núm. 91 de 26 de agosto de 2005, que enmendó el Artículo 3.6 de la Ley 54 para condicionar la participación del acusado en los programas de desvío a que este acepte la comisión del delito imputado y reco-nozca su conducta.

 íd.

 8 L.P.R.A. sec. 635. El delito de agresión sexual conyugal tipificado en la Ley 54 fue innovador cuando ésta se aprobó en 1989. Esto porque el Código Penal vigente disponía que el delito de violación no se cometía contra la mujer “propia”, es decir, contra la esposa. Por lo tanto, la Ley de Violencia Doméstica incorporó este elemento del delito. Sin embargo, en el Nuevo Código Penal de 2004 se incluyó el delito de agresión sexual que puede cometerse también contra la esposa e, incluso, el esposo.

 8 L.P.R.A. sec. 636.

 Incurre en el delito de adulterio tanto la persona casada que tiene relaciones sexuales con una persona distinta a su cónyuge como la persona soltera con quien tiene las relaciones. Art. 130 del Código Penal, 33 L.P.R.A. see. 4758.

 Según hemos explicado, la denuncia por el delito de agresión no subsana esta situación.

 Véase Opinión de conformidad, págs. 244-245.

 Art. 1.2 de la Ley 54, supra.

 Basta fijarse en los otros mecanismos que incorpora la Ley 54 para darse cuenta de que la integridad física y psíquica de las víctimas es el bien jurídico pro-tegido por el estatuto. Entre estas herramientas, la orden de protección inmediata evita la reincidencia al prohibirle al agresor acercarse a la víctima. Además, el que el oficial del orden público pueda arrestar al agresor sin tener una orden del tribunal, cuando tenga fundamentos para creer que se infringió la Ley 54, contribuye a evitar que en ese intervalo de tiempo se cobre la vida de la víctima. Por eso también, el policía tiene la obligación de orientar al denunciante sobre los servicios sociales disponibles, e incluso, transportarle a un lugar seguro cuando exista una amenaza a su seguridad. Todos estos mecanismos demuestran que el legislador estaba preocu-pado por proteger la vida e integridad física y emocional de la víctima que es vulnerable a los ataques de su pareja. Son herramientas que se han juzgado necesarias para proteger a la víctima del maltrato de pareja y atender las características espe-ciales de ese delito. Por eso, no están disponibles para otros tipos de delitos.

 Ganzenmüller, supra, pág. 15. Estos autores se refieren al caso común en que una mujer, luego de presentar una denuncia de violencia de pareja, quiere reti-rarla, lo que hace difícil presentar una acusación contra el agresor. Concretamente, relatan que “[l]a mujer suele comparecer a los pocos días en el juzgado para indicar que ya se ha reconciliado con su pareja y no desea intervenir en el procedimiento, modificando^ sustancialmente su declaración de forma que las contradicciones sean evidentes”. Id.

 Véanse el P. del S. 90 de 1989, el P del S. 470 de 1989 y el P de la C. 615 del mismo año.

 Silva Bonilla y otras, op. cit., pág. 58. Estas investigadoras se refieren a una narración hecha por una trabajadora social sobre la fuerte presencia de la violencia física en las relaciones entre amantes. La orientadora relató:
“Nosotras nos enteramos de muchos casos de mujeres a quienes sus amantes las maltratan. Esas mujeres no se atreven a pedirnos orientación y ayuda porque creen que nosotras las vamos a perjudicar por vivir con esas personas en violación a los reglamentos de estos tipos de residenciales (viviendas subsidiadas). Pero nosotras nos enteramos de todos modos porque los golpes son visibles y porque las demás residentes de los edificios lo comentan.” íd., págs. 58-59. Véase, además, el capítulo III, op. cit., pág. 97.

 Véase Opinión de conformidad, págs. 246-247.

 Encontramos un ejemplo de cómo las leyes ignoran una violación a un bien jurídico de menor importancia para proteger uno de mayor importancia en la ley federal Violence Against Women Act (VAWA), 42 U.S.C.A. secs. 13931-14040, que dispone excepciones a las leyes de inmigración para que las mujeres que se *275 encuentran residiendo ilegalmente en Estados Unidos y sufren de violencia domés-tica por parte de sus esposos o exesposos ciudadanos norteamericanos puedan recibir sus documentos de residencia. De esta forma, se le da más peso a la vida y la segu-ridad de la inmigrante que a su estatus migratorio ilegal.

 Véanse, por ejemplo, las Reglas 412 y 413 de Evidencia de Puerto Rico de 2009, sobre la inadmisibilidad de evidencia sobre conducta sexual de las víctimas de agresión sexual y hostigamiento sexual. 32 L.P.R.A. Ap. VI.

 Véase Instituto Centro Reina Sofía, III Informe internacional: Violencia contra la mujer en las relaciones de pareja, España, 2006, disponible en http:// *276 www.malostratos.org/images/pdfi,010% 20informe% 20reina% 20sofia.pdf

 véanse las estadísticas sobre violencia doméstica recopiladas por ¡a Policía de Puerto Rico y por el proyecto TendenciasPR adscrito a la Universidad de Puerto Rico en http://www.pr.gov/PoliciaPR/Estadisticas/ViolenciaDomestica.htm y http:// www.tendenciaspr.com/Violencia/Violencia.html

 Véase el recuadro sobre las víctimas fatales de violencia de género en el 2011, como parte del reportaje especial de portada “Imparable violencia de género” de la serie Basta ya, Primera Hora, 17 de marzo de 2011, pág. 4. Véanse también M. Rivera Puig, “Mata esposa y se suicida”, El Vocero de Puerto Rico, 17 de marzo de 2011, pág. 10, y J. Colón Dávila, “Comerciante mata a su esposa y se suicida”, El Nuevo Día, 17 de marzo de 2011, http://www.elnuevodia.com/despiadadoasesinato-916623.html. De los 10 asesinatos de mujeres a manos de sus parejas o exparejas consensúales ocurridos desde enero de este año, 7 han sido certificados por la Policía como asesinatos por violencia doméstica; los otros 3 se encuentran en investigación para clasificación estadística.

 En este sentido, debemos aclarar que la Ley 54 no está diseñada para pro-teger las uniones sentimentales y legales de hombres con mujeres. La opinión de conformidad cita este falso propósito, enfatizando en un supuesto requisito de lega-lidad de la relación que no contiene la ley, sino que fue mencionado en Pueblo v. Ruiz, supra, para darle mayor fuerza a la opinión mayoritaria de ese caso, con el fin de impedir que la Ley 54 aplicara a parejas homosexuales. No se puede sacar esa ex-presión de su contexto para exigir que las relaciones heterosexuales sean “legales” como requisito para brindar protección al miembro de la pareja que sufre actos de violencia. Véase Opinión de conformidad, págs. 241 y 246.

 A modo ilustrativo, exponemos a continuación algunos de los casos sobre violencia doméstica al interior de relaciones adúlteras que han llegado a nuestro Tribunal de Apelaciones en años recientes. En Pueblo v. Chico Rivera, KLCE20050361 (Panel integrado por la jueza López Vilanova y los jueces Córdova Arone y Escribano Medina, quien disintió; 30 de junio de 2005), la perjudicada era una mujer casada a quien su amante amenazó con hacerle daño si no volvía con él luego de que ella le anunciara su intención de terminar la relación adúltera. El Tribunal falló contra el acusado, quien alegaba que no le aplicaba la Ley 54 por la relación ser adulterina, y subrayó que el alcance de dicha ley no puede limitarse a las relaciones socialmente aceptadas, porque esta no fue creada para otorgar legitimi-dad a cierto tipo de parejas, sino para proteger de violencia a todos los involucrados en relaciones íntimas. Asimismo, en Pueblo v. Vélez González, KLAN0601657 (Panel integrado por los jueces Rodríguez Muñiz, Soler Aquino y Cordero Vázquez; 25 de febrero de 2008), los jueces señalaron que el planteamiento del acusado de que no le aplicaba la Ley 54 porque su pareja era una mujer casada carecía de todo mérito, ya que quedó probado que mantuvo una relación amorosa con la perjudicada durante 11 meses, lo que responde a una relación consensual sin cohabitación protegida por la Ley. El acusado llevó a cabo un patrón de persecución, intimidación y violencia contra su amante casada, que incluyó romperle sus pertenencias, decirle que mataría a sus hijos, amenazarla con un arma blanca, echarle gas pimienta, golpearla y tre-parse en el bonete de su auto cuando intentó huir. Véanse, también: Pueblo v. Valentín, KLAN200901279 (Panel integrado por los jueces Aponte Hernández y Cabán García y la jueza Cintrón Cintrón; 30 de junio de 2010) y Pueblo v. Flores Rodríguez, KLCE200900073 (Panel integrado por los jueces Feliciano, Hernández Serrano y Rosario Villanueva; 10 de julio de 2009). Este último, en alusión a lo comunes que son estos tipos de casos, comienza señalando: “Nuevamente regresa a este Tribunal de Apelaciones la controversia de si a una relación consensual adltera, dentro de la que surge un incidente de violencia o maltrato entre sus componentes, le son de aplicación las disposiciones de la Ley Núm. 54 de 15 de agosto de 1989.”

 Vicente, supra, págs. 580-581. Precisamente, el que se extendiera su al-cance para cubrir a las personas que están en relaciones fuera del matrimonio legal, incluso en relaciones de pareja ilegales, fue un paso importante en el proceso de reconocer que en Puerto Rico las relaciones afectivas familiares y sexuales están formadas en múltiples estructuras y no limitadas a la unidad familiar tradicional. íd.

 El Jefe de Fiscales de Girona, Carlos Ganzenmüler Roig, lo llama violencia complementaria. Ganzenmüller, supra, pág. 47.

 Véanse: Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 272; Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 296; 2 Diario de Sesio-nes 1371-1372 (1961). El señor Benitez, uno de los constituyentes, expresó que “el principio de que el ser humano y su dignidad constituyen la razón de ser y la justi-ficación de la organización política”. 2 Diario de Sesiones 1372 (1961).

 2 Diario de Sesiones 1503-1504 (1961).

 I. Ramos Buonomo, Análisis del Término 2004-2005: Tribunal Supremo de Puerto Rico: Derecho de Familia, 75 (Núm. 1) Rev. Jur. UPR 293, 319-320 (2006).

 para una discusión sobre los valores morales y cómo moldean inconsciente-mente nuestras acciones, véase G. Lakoff, “The Brain’s Role in Family Values”, en The Political Mind, Nueva York, Viking, 2009, págs. 75-91.

 8 L.P.R.A. see. 601.